Your Honor, good morning. Stephen Fischbach, privileged to be before the Court, honored to represent the appellants and plaintiffs, Oula Zakaria. California has long been the tip of the spear when it comes to product safety. Escola, Barker, Greenman, White, they were the foundation for a wide range of ensuing consumer protection statutes whereby consumers can seek redress for personal and financial injury, fraud, malconduct, under some of the most comprehensive statutes in the country. Particular to this case, California's unfair competition law, false advertising law, and the seminal California Legal Remedies Act, sorry, Consumer Legal Remedies Act, was designed to thwart the very conduct at issue here. Unfortunately, the laws are in place for Oula Zakaria and others like her. The incorrect application of those laws by the district court led to improper dismissal of her claims and extinguished not only her rights, but those of the rights of similarly situated class members. Let me correct me if I'm wrong, but I understood the district court to have granted summary judgment. Yes. For failure to approve any damages. Yes. Damage is an element of your claim. Yes. And so once he decided there was no, he wasn't going to, he decertified the class, then he said, you don't have any evidence of any damages, therefore judgment is a matter of law for the defendant. Yes. And we think that that's, there's error in, at multiple levels from that. And starting backwards from how the court determined it with regard to the granting of the summary judgment, there were, there was evidence in the record that in fact, there would not have purchased the relevant Gerber product at all, had she known or been told or advised or not been misled into believing that there was some allergy benefit to buying it. And that in fact, she would have not, certainly not. I think the district court judge recognized that. Yes. Correct? I believe so. And there, therein lies part of the error in that. Well, but just, well, just because somebody suffered, has established a vial, you know, maybe a false advertising violation, still they, they've got to establish their damages and how, and here when you brought it as a class action, then you have to establish damages that can be awarded class wide. Yes. And the, otherwise you get into problems of, you know, of whether a class action is an appropriate vehicle for this case. We believe that, that we satisfied the requisite damages criteria, not only for Ms. Zakaria as an, as an individual for purposes. But she can test it on her own. She can put in an affidavit that says, I wouldn't have, had I known that, that they were misrepresenting what the FDA said, I never would have paid this, any amount or this amount for, for this product. Yes. And that's her damage and it's irrefuted. There's no contrary evidence that in fact she did pay for this product, that in fact, the plaintiff's evidence from that point is that there was a mislabeling. There was a misrepresentation. Well, I don't want to, I don't want to dwell on, on, on her damages for a moment because I'm concerned mainly about, I thought your main concern was with the decertification. Yes, it is. And let me go directly there. And the problem, and the issue is this, and the procedural history in this case is important in that, for starters, we've already qualified, the class was already certified in the, in the first instance. Right. But is that, you know, under the central district, you've got to bring your motion for class certification a little bit ahead of time. And we did that, but we did that in conjunction with a Daubert hearing with, with Professor Howlett. Right. And, and during that hearing, there was a, both sides had an opportunity to present their position and points on, on Dr. Howlett's, Professor Howlett's conjoint analysis and whether it was going to be adequate for what the purpose of what we thought it would be. The court indicated over strenuous objection of the defense, Professor Howlett was qualified, her study was appropriate, and most importantly, that it met the Comcast standard, that it was, it was reasonably related to the damages sought by the plaintiff. Right. And so once we got to that point, and it's important because the, the conjoint analysis that the court accepted from, from Professor Howlett, it's the same conjoint analysis that it later said, well, there's something wrong with this analysis. In other words, after the data was run through, the hard part isn't. Well, I, I understood him to say that, that her methodological approach to how, to, to how she would measure damages was appropriate under Daubert. Yes, conjoint analysis, but it's not just, it's not just conjoint analysis, it's the, it's the manner in which the conjoint analysis was going to be formulated. Well, she had to lay out, she had to lay out how, how she would conduct a, a conjoint analysis study and explain it to the court and show the court that she could come up with, with a measure that would be, that could be utilized class-wide. Yes. Correct? Yes. And she also coupled that, though, with a hedonic, is it hedonic, hedonic regression analysis? Hedonic regression. Hedonic regression. What, what, what she said was that you could use either. Yes. Either. And, and everyone agrees with that. In fact, the defense doesn't, they don't say that a conjoint analysis is incorrect in this application. Everyone acknowledged that you could use both, and Professor Howell said, we're going to use. Okay, so what the district court said was, okay, fine, you can use this conjoint analysis, you get past Comcast, and it could be class-wide. The problem is, as a matter of law, is that the conjoint analysis only measures, or only takes a look at the subjective view of the consumer. That's what, and it doesn't, it's not market-based. That's what could be the case. And that's what some courts have found. Although, I will say that the vast majority of the cases are cited. And, and look, when you read the, the court's opinion on this, it tracks very specifically with the plaintiff's position all the way through. It's like we get, all of a sudden, we, we're walking down the aisle, we're fine, you get to the altar, and it's a runaway bride. Like, what happened? We, we went through all these cases. This is, in the plaintiff's position, it's a, it's a failure to understand, number one, conjoint analysis. And, and I'll tell you, I'm here making an argument for you because I didn't want to learn about conjoint analysis and hedonic regression analysis and economical central statutes and, or, or, or statistics. The court expressed in its, at the hearing that it also was, was somewhat uncertain about what a conjoint analysis is. At ER 110, Judge Krontat said at line 15, maybe I'm wrong, maybe this isn't how this should be evaluated, but that's what I'm, that's what I want to make sure I understand. And, well, there doesn't seem to be any dispute, as I understand, and, and you, and I'm certainly no expert in these, in these marketing studies, but it measures a consumer, what a, what a, subjectively, what a consumer would pay for, for a particular aspect of a product. Yes. Right? That's one, that's one, one element of it. And, and everyone agrees that's correct. But isn't that, isn't that the element here that Judge Krontat was concerned about? It was just a subjective determination, and it wasn't tied to the market. And when you look at market-based realities, and when you look at how, how the California Supreme Court has said you measure restitution for purposes of the unfair competition law, you look at, at the difference between what a consumer would have paid had he not, had the consumer had the full and truthful information, as opposed to what the consumer actually paid. Yes. Right? It's that gap. I understand. And that, that gap is a gap if there's a problem with the conjoint analysis. But in this case, we don't have that problem. Professor Howlett. Well, excuse me, I think you do have the problem, because I think the district court erred in failing to grant the motion to exclude the testimony of the expert witness in this case. And the, the court stated Howlett did not evaluate empirical marketplace data to determine whether the customer's actually paid a premium based on the challenge language. Goes on to talk about how the conjoint analysis does not show the difference in the amount paid for goods, say, start in general, and its value in the marketplace, the measure of damages in a restitution case's price paid versus value received. The problem here, as the Supreme Court makes very clear in the Daubert opinion itself, the analysis and the opinions have to fit the case. And the trial court is saying here that it doesn't fit. That's not the terms that they use. And so the problem is actually back here with the Daubert motion, which was denied. And that's an abuse of discretion standard. I understand that. But it looks to me like there was an abuse of discretion. It looks to me like if you end where the trial court ended with this kind of ruling, the problem is fundamentally one of, of not having an expert who gives opinions that fits the case. There's no cross appeal on the issue of whether or not the witness should have been excluded under Daubert. There's no appeal on that. The only, and so we're not, we're not here to question whether or not Professor Hallis had the requisite skill qualifications or that her study was appropriate. We know all that is, is already been accepted by the court. This case gets very close to, to the, to this, this court's decision in Lambert, where you have a certified class, a conjoint analysis being done, and somebody says, we're going to decertify it. And this court said, under the circumstances, you don't need to. And in this case, That was a no value case though. I understand, but it's, it's No, that was an easy case. Nobody, everybody, the whole, the whole, the theory of the plaintiff's recovery was this, we wouldn't have paid anything. Understand. Zero. But it's still a conjoint analysis case. And in the end, conjoint analysis is nothing more than doing what doctor, what Professor Hallis said. And that is, look, I'm going to set up the conjoint analysis, and she did that. And it's not a surprise that the defendants objected or didn't like it or didn't like the result. Defendants never liked the result in the damages issue. When damages aren't even an issue, they object to the damages amount. The point is that once you run it through this conjoint analysis, this is what Professor Hallis did. Got the study, we found out it was an approximate 42 cents difference. Then you take the market information, the data that we got from Gerber that says this is how much we sold, and this was the price, and this is that, and you do math. You do math. And that's, that's all that needed to be done. The fact that the court in the end said, well, I don't, I don't, this doesn't seem to be right. That's not, that's not the standard. It's just a math problem then. And, and Professor Hallis... Well, let me ask you this. What was the value of the, of the, of the formula to the average consumer without the label? It would be, there's a, there's a price premium of, of 42 cents. So if the product was... No, no, no. What is the market-based value of the product without, if you looked at the... Without this label. If you take Gerber sales data, and we have some of that, and it's in the record, and it, it's, some of it is sealed. But if you take that sales data and extrapolate, doing the math, how much product was sold divided by the total amount of, of, amount of, of profit made, then you decide how much, how much was it sold for. If it was sold for a dollar, then it was... Is there any opinion by, by anybody about what the value of the formula was without the label? That's the conjoint analysis. And the, and the... Other than the conjoint analysis. Yes, because what, what we have underneath is the underlying Gerber marketing information, which says, look, we want to get our product up to the Similac numbers. We can't just do that by saying we're going to increase the price. We have to do something to this to make it a perceived value to the consumer. We have the marketing information. We presented that to the court. We said this is... So, let me ask you this. So, is there any Gerber information that's, that you're able to rely upon that shows that there was an added increase when they added this charge, price increase when they added this label? The, the, the answer is yes. Because they wouldn't have been able to recommend the price increase to the, to the stores without having a corresponding ability to say this is why we want to raise the price. See, they're a third in the marketplace. They wanted to make more money and gain more market share. And they couldn't do it with their lower price... Well, they could do it by prices. They could lower prices. But to get people to buy the product, you had to give them a reason to, you had to give them a reason to pay more money. The regular Gerber formula without the sticker that didn't say this is going to prevent allergy... Sold at a price lower than Similac? Sold at a price lower than Similac and sold at a price lower than the Gerber Good Start with the foil wrapper. And that's the whole point of this, is that the consumer then relying on Ms. Zakaria, relying on the wrapper, said I'm going to pay more. And therein lies the issue of why when Dr., when Professor... Wait a minute, wait a minute. I just want to see if I understood what you just said in response to Judge Baez's question. You're not, are you saying that there was not an, let me see, how do I want to say this? Are you saying that, that there was not an added market-based increase in price when they added the label? There was a market increase in price when they added the label. Okay, and do we, is there any information in the record that demonstrates what that added price was? No, because what we're left with is we don't, we're not able to get that information. Why not? We don't, it wasn't presented to us. Did you ask for it? Yes, and all we got from Gerber was the sales data during those relevant years, not the... Well, you can extrapolate from that. You can say before the label, this was the price. After the label, this was the price. We were given sales data from, during the relevant class period when the price was adjusted, but Professor Hallett in her study recognized that and set price points at 50 cents and 70, 60 cents and 85 cents and 90 and then $1.10. In other words, she covered the range of pricing spectrums for baby food. Okay, so explain to me how she used these various price points to come up with an opinion that an average consumer would be willing to spend 42 cents for this additive. I wish I could explain that to you, but as I said, I'm not an expert on consumer analysis. I read her declaration and her report and she talks about these price points, but it's just not clear to me how they fit into this. I understand, and that's part and parcel of what we're asking for, the reason why we're asking for the court to step in to this. That's exactly the point. We're not, respectfully... Well, you're the plaintiff's lawyer. But I'm not, I am not, what I'm good at is asking questions. I am not the guy who can come in and explain to anybody, look, here's what a conjoint analysis is. Let me ask you this. What do you think the California Supreme Court meant when it defined how you get restitution? Well, if we're talking about Kwikset, then I think the answer... Yes, that's what I'm talking about. I think that it means exactly what it says. Isn't that the law that we have? I mean, that's, when we did Plutsky, we relied on Kwikset. So what do you have to, you know, if you were before the California Supreme Court, what would you have to demonstrate? Kwikset, as the court recognizes, was an interpretation of Prop 64. And that's what the court was trying to assemble. This is what Prop 64 now requires. What we've demonstrated in this case is, in fact, there was a price paid. Let's assume Professor Howell's right. It was a price premium of 42 cents. And that money didn't just go into the atmosphere. It went to one place. It went to the company that was, that raised the prices in the first place. It went to Gerber. So when you say there has to be something lost and then something gained, we have in this case the loss and the gain that the California Supreme Court discussed under Kwikset. But it was really, that case wasn't designed to talk about that. It was really making sure that everyone understood that after Prop 64, things had to be determined in a slightly different manner. Because there's other cases that talk about restitution and what restitution means. And when you look at those cases, you're left with the same. When you look at Pulaski v. Google, which is offsided by the court and both parties. When you look at Bank of the West, restitution serving dual purposes. Restitution under Pulaski is the measure, is the difference between what a reasonable consumer paid and what they would have paid at the time of purchase with the fraudulent or admitted information. I mean, it can be multiple things. I don't think that there's been anything in this case to demonstrate that the plaintiffs cannot provide this information to the court. And so what I think is appropriate would be, firstly, the case should be overturned. I think the court erred. I think it was an error because it didn't understand number one, the nature of the law, including how Kwikset limited its ability. But more importantly, how the line of cases, including Lambert, impacted. But more easily, and maybe even more efficiently, is get this back down to the district court where we can have a serious discussion about what the problem is or how conjoint analysis either does or doesn't work. Not just... Well, this was a motion to vacate certification and a motion... I guess, together, there was a motion for summary judgment or did he just grant summary judgment sui sponte? There was a motion for summary judgment as well, but it was all tethered to the same damages issue. And so all of this really relates to, look, is Professor Hallett's conjoint analysis, is it okay? All right. Why don't we hear from you? I'll let you go way over. Let us hear from the other side and I'll give you a few minutes for rebuttal. Thank you, Your Honor. Good morning. If it may please the Court, Jeffrey Castello, Kelly Dryen Warren, LLP for Apelli Gerber Products Company. Your Honor, Appellant would send this same flawed report right back to the District Court and we'd be right where we are right now. This wasn't the first report that Professor Hallett submitted to the District Court. The first report was in connection with her moving for class certification. And it was an invitation to the District Court to say, listen to what I tell you I can do. Listen to the proposal that I have in this report. It had no substance to it at all. It was plain vanilla. Notably, in that very first report, Professor Hallett said... You mean her declaration? In her declaration, Professor Hallett said that I can take the price premium paid... Which paragraph are you reading from? I'm looking, Your Honor, at ER 743. Yes. Paragraph 26. Got it. She says, I'll look to the price premium paid, which has been the only measure of damages ever sought by plaintiff in this case, by consumers for a specific product attribute such as, quote, reduces an infant's risk of developing allergies, close quote. And it can be determined by integrating the results of conjoint analysis into econometric models developed from readily available marketplace datasets, such as those from Symphony IRI in Nielsen. So right from the very beginning, Professor Hallett contemplated that she would take the results from this conjoint analysis, which only demonstrates a subjective survey participants willing to pay for the product that she puts up on the screen. But then she said, I will measure that against a different form of econometric hedonic regression analysis, which takes real world market data, not just of the product at issue, but of comparable products. Did she say she would actually do the hedonic regression analysis? She said or, but in the paragraph that I just read to Your Honor, what she said was she would integrate the results of the conjoint analysis into econometric models developed from readily available marketplace datasets, such as Symphony and Nielsen. Didn't she say that she was not qualified to do a hedonic regression analysis? Astonishingly, Your Honor. At her deposition, despite telling Judge Kronstadt that it could be one or the other, she said she's never done one. Never in her career and couldn't for this case. And wouldn't that analysis prove or establish or at least offer some proof of what the court thought was necessary in this case? I think it was a potential check against a runaway conjoint analysis. You can create a conjoint analysis that gets you to any result that you want. There has to be a check on it. There has to be a real world check where the data is tethered to market realities. And that's exactly where infant formulas are bought and sold every day. I don't believe that she could show anything different because there is an unrebutted fact in this case that containers with the tamper evidence seal that she complains of were available in the same stores, on the same shelf, with a completely different tamper evidence seal. But they all sold for the same price. There's unrebutted evidence. Is that in the record? It's in the record, Your Honor. Who produced that data? We did, Your Honor. We produced it in the form of declarations of a person who went to a store when the complaint about tamper evidence seal was on a shelf next to a container, same exact size container, being sold for the same price in the same store. By Gerber. By Gerber. By Gerber, Your Honor. Which puts the lie to this conjoint analysis. It shows it for what it is. That's why there are times when a conjoint analysis may tell you some aspects of behavioral thought processes of consumers. But, as in Saavedra and Joy and in the Apple case, if you don't tether the results of the conjoint analysis to real world market data, you can say anything you want. And that's exactly the problem here. It's different than... How do you answer your learned friend's point that you aren't appealing the ruling on the Doebert issue? You're not saying that the declaration of Dr. Hollis should be stricken. We did not appeal, Your Honor, because there was no need to. Because in the district court's analysis, it stood for exactly the proposition that it was. I can get consumers to give me any number I want. And based on that, Judge Cronstadt determined that is not an accurate measure of damages. And it could never be. And it's correct. We did not appeal that ruling. I don't agree with Judge Cronstadt's decision on class cert when he said it could go forward. But I lived this case. And so I saw the final report that's at issue in this case, I saw it come in. I saw it come in in July of 2016. And there was no mention of any historical market data. At that point, there wasn't much left to do, really. The plaintiff's solution is, well, I could take this conjoint analysis and I can get out a calculator based on sales numbers and I can just add them all up. But that doesn't do anything. That does not show us what comparable infant formulas on the market, two of which in her original complaint, she said she was buying, which show no price difference at all. How do we know that? Because that's in the record, Your Honor. Is it her declaration or is there a survey study or what the market price was of similar baby formulas? What it shows are contemplated price increases based on competitive market realities. Contemplative? Contemplated but never implemented, Your Honor. Gerber had assessed what the market was doing. All of these infant formula manufacturers look at the market to determine where they each stand in relative position and they look at prices. What I get from you is that Gerber had Gerber without label without the allergy prevention label, Gerber with label and Simulac and they all had the same price. That's right, Your Honor. And not only that, but in the goods... Label, violation, no harm, no foul. The label never mattered. It never mattered to pricing and that is if we're going to talk about Comcast, the theory of liability in this case was the label's false and I've been damaged. She never proved damages. She's disappointed. I'm sorry, Your Honor. She's disappointed. I'm not sure she was disappointed because the record evidence in this case shows that her doctor recommended a formula. The record evidence shows that that doctor recommended a formula that wasn't Gerber Good Start Gentle. It was a different formula. And the only objective evidence in this case about her actual purchases related to the Gerber Good Start formula that the doctor recommended. And besides the fact that Gerber Good Start Gentle was found on a shelf with two different labels at the same time but sold for a different price, there's an entire line of Good Start products and all of the pricing was the same for those products regardless of whether it was Gentle or Soothe or Soy. And none of the other products even had the label that this plaintiff complains about. And we have just the perfect Comcast problem and that's what Judge Kronstadt struggled with. He was told that he was going to be provided with a measure of damages that Dr. Howlett never delivered on. She told him, I can get the information. It's readily available. And it is. Anybody can buy it. But she never did it. Nobody ever did it. There's no expert in this case for Plaintiff other than Howlett. And nobody came forward with an analysis of that market data. But Gerber had done a market analysis. Not in the form that Judge Kronstadt thought Plaintiff's counsel was going to. There's a constant market analysis of all competitors, but not in this manner. Was there any analysis on Gerber's part that with this new label we could up the price? Zero. No record evidence that any pricing  with the label that's being complained about. And it's unrebutted through a declaration submitted by Gerber, that Gerber never priced based on advertising or marketing messages. It was the last thing it considered when it considered pricing. So the label was intended more to help Gerber develop a better market share. What that label was designed to do was to make a claim that was founded on science. And none of the science was ever decided in this case, but the science is deep and it's substantial. And that label was a means to communicate a potential benefit to purchasers who are going to get better market share. Everybody sells something to get better market share, Your Honor. Everybody does. You don't have to increase the price, but if you can entice a consumer to buy your product. Every advertisement on TV is designed to sell. That's what advertising is for and that's what companies that are in the business of selling products try to make more money. It's a little different than what happened in Pulaski. Your Honor probably remembers in that case that there was only one market. It was created by Google in the manner in which to determine damages in Pulaski, it was built right into Google's own algorithm for this bidding process. It was a no-brainer. No offense, Your Honor. I understand the decision, but there was really no argument to be made. That's not the market we're talking about here where there are multiple types of formulas that people buy for a bunch of different reasons. But only one attribute was tested in this infirm conjoint analysis. That gets me back to the district court. When it was finally delivered to the district court, it was sort of left like, oh, we're in the door now. Just get us to a jury. But that did nothing. That didn't improve restitution. That didn't improve actual damages. This plaintiff never sought an injunction, so she couldn't ask for an injunctive relief based on this analysis. It was only really about the price premium. And there was a desperate attempt to get to a price premium, but the final price premium in its absurdly high number was never checked against the market where infant formulas are sold. And that was the problem that Judge Cronstadt was presented with. What do I do with that? He determined that it's not an adequate measure of the damages she's always sought in this case. A return of the added price. I'm sorry, you're wrong. A return of the added price that she allegedly paid. Yes, Your Honor. Your Honor, I have time left. Are there any other questions? I have a question. What does the term hedonic mean in hedonic regression? The best I can explain, Your Honor, is that economists attempt to take an attribute for a product and to isolate that out against other variable attributes and try to determine by doing a regression analysis moving backward in time determine whether that attribute had anything to do with the prices going up or down. And hedonic means you like it? What individuals prefer. What everybody searches for. A better life. And if a hedonic regression analysis does anything, I suppose it's meant to show us what we're all looking for. Whatever that product might be. The pursuit of happiness. These are tools that marketing people use all the time. They do, but for different reasons, Your Honor. And it doesn't make it perfectly fit into litigation. Conjoint analysis has been around for a long time, but not that long in litigation. And so have all sorts of econometric analyses been around for a long time, but not necessarily for the purposes that are being used today. And it just doesn't make them right just because somebody can conduct a conjoint analysis. It has to be done to the rigors of the science. And I agree that with Judge Royal that the Court misapplied the Daubert Standard when it looked at this conjoint analysis. And I think that when Judge Kronstadt considered what he would do with it on summary judgment, in other material fact, that's when he called its reliability into question because that's when the rubber hits the road. When a jury instruction goes out and it relates specifically to this infirm conjoint analysis and there was nothing to do with it. It didn't get the job done. I gather if there had been evidence that Gerber had increased the price after they added this label that that would have been much easier for the plaintiffs. There would have been a banner, Your Honor. They would have walked into court on the motion to decertify the class and the motion for summary judgment with a banner. But instead what we got were tortured interpretations of company documents that said nothing that the proposition they were cited for. Okay. Thank you. You can have two minutes, everybody. We don't have the memo from Gerber that says we're going to raise the prices and we're going to do it falsely so we can increase our market share by putting a mislabel on the product. But that's what the case is and that's what our complaint alleges and that's what the facts as we've indicated and are replete with the record indicate. I think your position is correct as to what they could have done but not what they did. No, what they did but in fact they did and the reason why what we know about this is that, again, Gerber had a product and it wanted to sell more of that product. It couldn't sell more of that product at an increased price and make the product it couldn't be more valuable to people. So it kept the same price? No. It increased the price and said we're going to match Similac told its marketing people we want to match Similac, raise the price and sell the product with this The way they do this though is by misleading the consumer, misrepresenting the facts about allergies. You were not able to obtain data or information from Gerber that shows that they in fact raised the price. Right. That's part of the You just said that they raised the price but you can't document that. They indicated that they had to raise the price to match the price to match the Similac which was the top of the line Wasn't this part of the problem that the district court had not having the real world numbers the actual wasn't that one of the fundamental problems? Yes, but I think part of the problem is that for purposes of the conjoint analysis that information isn't required. Dr. Hallett I kept saying professor. It may not be required for that but it's required for the proof authorized under the statute under which you brought this claim. No, I don't think so and the reason why is because at ER 754 and 755 paragraph 68 through 72 of Dr. Hallett's declaration, she lays out specifically how once you have the underlying conjoint analysis accomplished then it's easy. She says it's simple to calculate damages in this case and it can be done. Again, this has to do with whether or not the conjoint analysis was done properly and the court district court said twice I'm not the professor Dr. Hallett is okay we'll let her testify. Her method's fine passed the Daubert standard and more importantly twice said under Comcast this methodology was properly and correctly tethered to the plaintiff's claims. You don't get to go back then and say I don't like what she did or I don't appreciate it or I think it should have done differently. The defendants didn't present any contrary evidence. Let me ask you. You just said a moment ago that they raised the price. They raised the price to match Similac yes. Okay, they raised the price. Where is that documented in the record? Some of this material has been filed under seal and we're now discussing some of this. Okay, so just tell me is it in the sealed material? Yes, I believe so where the evidence is of how much, what the price points were for these various products of Gerber during certain time periods. And it's part of the data information that Dr. Hallett had when she made, created the conjoint analysis. We've already had a discussion on the propriety of the conjoint analysis. We've done that now twice. The only final things I want to say is that the alternative to the district court's position is I think an easier one and that is number one the case law is clear in California that issues of damages can't, don't result in a class being decertified. So we have that body of law under SPAM and Lilly v. Jamba Juice and then finally the issue of it being that even if you did, I'm sorry that's under Lambert, even if you were going to take the case and split it, you can do so by having a later issue on damages, splitting liability and damage and otherwise. Thank you. We appreciate you. What is that? The material under seal, the only discussion of potential raising of prices was never implemented and that's in the record. Okay. I know where the record is. I can find it. Thank you. The matter is submitted and we appreciate your arguments. We realize you had to travel up from down south so thank you very much.
judges: Paez, Bea, Royal